**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff*,

v.

ROBERT F. KENNEDY JR., *et al.*,

*Defendants*.

Case No. 1:26-cv-03498-RCL

ORAL ARGUMENT REQUESTED

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS


Page

INTRODUCTION ..... 1

BACKGROUND ..... 4

- A. Section 1115A of the Social Security Act ..... 4
- B. Medicare Part B ..... 6
- C. The Challenged GLOBE Rule ..... 7
- D. The Present Controversy ..... 12

LEGAL STANDARD ..... 13

ARGUMENT ..... 13

I. GLOBE EXCEEDS CMS'S STATUTORY AUTHORITY. ..... 14

- A. GLOBE Triggers the Major Questions Doctrine. ..... 15
  - 1. GLOBE is a matter of "vast economic and political significance." ..... 16
  - 2. GLOBE is inconsistent with congressional practice. ..... 19
  - 3. GLOBE is an unprecedented exercise of CMMI's authority ..... 21
  - 4. CMS's efforts to escape the major questions doctrine fail. ..... 24
- B. Section 1115A Does Not Authorize—Much Less Clearly Authorize—GLOBE. ..... 26
  - 1. GLOBE is not a "test." ..... 27
  - 2. GLOBE is not an "innovative payment or service delivery model." ..... 31
  - 3. GLOBE does not "address[] a defined population for which there are deficits in care." ..... 36
  - 4. GLOBE does not "waive" existing requirements. ..... 38
- C. GLOBE Violates Other Provisions of Federal Law. ..... 41
  - 1. GLOBE violates Section 1182 of the Social Security Act. ..... 41
  - 2. GLOBE violates federal appropriations laws. ..... 42

II. IF SECTION 1115A AUTHORIZES GLOBE, IT IS UNCONSTITUTIONAL. ..... 43

- A. As Interpreted by CMS, Section 1115A Would Violate the Presentment Clause. ..... 44
- B. As Interpreted by CMS, Section 1115A Would Violate the Nondelegation Doctrine. ..... 45

CONCLUSION ..... 45

## TABLE OF AUTHORITIES


Page(s)

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 2, 24, 26

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) .......... 45

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
509 F. Supp. 3d 482 (D. Md. 2020) .......... 11

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994) .......... 27, 28, 29

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... *passim*

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024) .......... 14

*Cal. Life Scis. Ass'n v. CMS*,
No. 20-cv-08603, 2020 WL 7696050 (N.D. Cal. Dec. 28, 2020) .......... 11

*Clark v. Martinez*,
543 U.S. 371 (2005) .......... 43

*Clinton v. City of New York*,
524 U.S. 417 (1998) .......... 44, 45

*Fischer v. United States*,
529 U.S. 667 (2000) .......... 6

*Fisher v. PBGC*,
468 F. Supp. 3d 7 (D.D.C. 2020) .......... 13

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) .......... 34

*Gundy v. United States*,
588 U.S. 128 (2019) .......... 45

*INS v. Chadha*,
462 U.S. 919 (1983) .......... 44

*King v. Burwell*,
576 U.S. 473 (2015) .......... 17

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) ... *passim*

*MCI Telecomms. Corp. v. AT&T*,
512 U.S. 218 (1994) ... 20

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ... 35

*Newton-Nations v. Betlach*,
660 F.3d 370 (9th Cir. 2011) ... 29

*NFIB v. OSHA*,
595 U.S. 109 (2022) ... 16, 24, 25

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ... *passim*

*Paroline v. United States*,
572 U.S. 434 (2014) ... 31

*Pub. Utils. Comm'n of State of Cal. v. FERC*,
143 F.3d 610 (D.C. Cir. 1998) ... 42

*Reed v. Brex, Inc.*,
8 F.4th 569 (7th Cir. 2021) ... 35

*Regeneron Pharms., Inc. v. HHS*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020) ... 11

*United States ex rel. Silingo v. WellPoint, Inc.*,
904 F.3d 667 (9th Cir. 2018) ... 34

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012) ... 27

*Tex. Tech Physicians Assocs. v. HHS*,
917 F.3d 837 (5th Cir. 2019) ... 34

*United Space All., LLC v. Solis*,
824 F. Supp. 2d 68 (D.D.C. 2011) ... 13

*United States v. Molina Healthcare of Ill., Inc.*,
17 F.4th 732 (7th Cir. 2021) ... 34

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*Util. Air Reg. Grp. v. EPA*,
573 U.S. 302 (2014)....................14, 21, 24

*West Virginia v. EPA*,
597 U.S. 697 (2022).................... *passim*

*Whitman v. Am. Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001)....................15, 45

*Widakuswara v. Lake*,
779 F. Supp. 3d 10 (D.D.C. 2025)....................44

**Constitutional Provisions and Statutes**

U.S. Const. art. I....................3, 43, 44, 45

5 U.S.C. § 706....................13, 45

18 U.S.C. § 209....................43

20 U.S.C. § 1098bb....................40

31 U.S.C.
§ 1301....................43
§ 3302....................43

42 U.S.C.
§ 1315....................27
§ 1315a.................... *passim*
§ 1320a-7a....................40
§ 1320e-1....................41
§ 1320f-3....................20, 21
§ 1395j....................6
§ 1395jjj....................33
§ 1395k....................6
§ 1395*l*....................34
§ 1395u....................6, 20
§ 1395x....................6
§ 1395w-3a....................6, 7, 10, 20
§ 1395w-6....................6
§ 1395w-114b....................21, 40
§ 1396w-8....................34

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

### Regulations

42 C.F.R. § 427.600 ....................40

85 Fed. Reg.
55,292 (Sept. 4, 2020) ....................24
76,180 (Nov. 27, 2020) ....................10

86 Fed. Reg.
61,402 (Nov. 5, 2021) ....................24
73,986 (Dec. 29, 2021) ....................11

89 Fed. Reg. 65,724 (Aug. 12, 2024) ....................42

90 Fed. Reg.
60,244 (Dec. 23, 2025) ....................11, 12, 16
60,338 (Dec. 23, 2025) ....................11, 17, 25

91 Fed. Reg.
49,570 (Aug. 4, 2026) ....................25
62,936 (Oct. 2, 2026) .................... *passim*

### Other Authorities

American Heritage Dictionary (5th ed. 2022) ....................27, 39

Congressional Budget Office, *Research and Development in the Pharmaceutical Industry* (Apr. 2021) ....................18

GAO, 2 *Principles of Federal Appropriations Law* (3d ed. Mar. 10, 2016) ....................43

H.R. Rep. 108-178, pt. 2 (2003) ....................7

Joseph A. DiMasi et al., *Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J. Health Econ. 20 (2016) ....................18

Joseph R. Biden Jr., Remarks on Efforts To Reduce Prescription Drug and Health Care Costs (Aug. 29, 2023) ....................19

Julia Wahl et al., *QALY Use in Selected OECD Countries*, Copenhagen Economics, at 3 & tbl.1 ....................42

Lydia Saad & Megan Brenan, *Cost Leads Americans' Top-of-Mind Healthcare Concerns*, Gallup (Dec. 15, 2025) ....................19

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

Merriam-Webster Dictionary Online ....................................................................................27

## INTRODUCTION

In the Medicare program, Congress made a choice: The amount the program pays for covered drugs under Part B should be primarily based on the "average sales price" of the drug on the open market. That choice reflects Congress's determination that market-based pricing is necessary to support the immense investments in research and development that have made America the global leader in pharmaceutical innovation and patient outcomes. And it reflects Congress's disagreement with the decisions made in foreign countries to artificially suppress the price of drugs, stifling innovation and making it harder for patients to access lifesaving medicines.

In a recently published final rule, the Centers for Medicare & Medicaid Services (CMS) seeks to replace Congress's choice with the agency's own. Through its Global Benchmark for Efficient Drug Pricing (GLOBE) Model, 91 Fed. Reg. 62,936 (Oct. 2, 2026), CMS asserts unilateral authority to radically reshape the Medicare program and the U.S. pharmaceutical industry. GLOBE would untether Medicare pricing from the Medicare statute and the American market, instead importing price controls from 19 foreign countries and instituting a "Most Favored Nation" (MFN) pricing regime by demanding that manufacturers of Part B "GLOBE Model drugs" pay "rebates" that effectively cap the drugs' price at an MFN "benchmark" calculated based on the prices in those 19 countries.

The GLOBE Rule exceeds the agency's statutory authority. CMS's actions follow a playbook that is by now familiar to courts: an administrative agency claims a highly consequential power to transform a critical government program or sector of the American economy without clear congressional authorization. In case after case, the Supreme Court has rejected that playbook by applying the major questions doctrine and the "common sense" principles it embodies. *See, e.g.*, *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243, 255 (2026); *Biden v. Nebraska*, 600 U.S. 477, 497 (2023); *West Virginia v. EPA*, 597 U.S. 697, 735 (2022). GLOBE is a poster child for

the major questions doctrine. It carries vast economic and political significance: It will affect hundreds of millions of dollars in Medicare spending in the immediate term, with billions more at stake in future years. GLOBE contravenes congressional practice: Congress has repeatedly "considered" but "chosen not to enact" the same MFN policies that CMS now seeks to unilaterally impose. *Nebraska*, 600 U.S. at 503. And GLOBE is unprecedented: Except for CMS's attempt to introduce MFN pricing during the first Trump Administration, which was quickly blocked by three district courts, the agency has never claimed the power to break so sharply from Congress's Medicare decisions. Indeed, CMS admits that GLOBE "represents a novel approach to drug pricing within the Medicare program." 91 Fed. Reg. at 63,079.

To justify its aggressive overhaul of Medicare drug pricing, CMS relies on a "wafer-thin reed," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021): Section 1115A of the Social Security Act. Section 1115A grants a CMS subagency called the Center for Medicare and Medicaid Innovation (CMMI) authority to "test innovative payment and service delivery models to reduce program expenditures." 42 U.S.C. § 1315a(a)(1). As four Justices have observed, that provision is a "minor" and "ancillary" one. *NFIB v. Sebelius*, 567 U.S. 519, 704-05 (2012) (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). It permits CMMI to "study . . . how to spend less government money" by experimenting with innovative ways to structure payment and healthcare delivery within Medicare. *Id.* at 704. But it does not provide carte blanche for the agency to overhaul Medicare drug pricing to advance policies that Congress has not authorized.

Every single feature of the statute's language confirms this conclusion. "[E]ven when examined using the ordinary tools of statutory interpretation," Section 1115A "provides no authorization for" GLOBE—"let alone 'clear congressional authorization' for such a program." *Nebraska*, 600 U.S. at 506 (citation omitted). Section 1115A requires CMS to "test" whether a

model will "reduce program expenditures"; a price-control policy with the predetermined effect of cutting CMS's costs at manufacturers' expense does not satisfy that requirement. Section 1115A permits CMS to develop only "innovative payment and service delivery models" that tinker with *how* payment or healthcare services are *structured*; GLOBE's absolute cap on *how much* Medicare pays for covered drugs does not fit. Section 1115A also requires CMS to "address" a "defined population" experiencing "deficits in care"; GLOBE instead applies to a random subset of Original Medicare Part B beneficiaries selected based on ZIP code, not a shared deficit in care. And Section 1115A permits CMS to "waive" requirements of the Medicare statute in certain circumstances; it does not grant the agency power to rewrite the statute by adding new and onerous obligations. For each of these reasons, CMS cannot shoehorn its MFN objectives into the "modest words" of Section 1115A. *West Virginia*, 597 U.S. at 723 (citation omitted).

GLOBE's legal infirmities do not end there. GLOBE imports other countries' drug prices even though they set those prices using a discriminatory measure that Congress has specifically prohibited CMS from using to set Medicare reimbursements. And GLOBE violates bedrock principles of appropriations law by allowing CMS to augment its funds independent of Congress. Finally, reading Section 1115A to authorize GLOBE would put the statute in irreconcilable conflict with the Constitution. Article I's Presentment Clause requires Congress, not agencies, to enact, amend, and repeal laws. And the nondelegation doctrine forbids the Executive Branch from exercising lawmaking power without direction from Congress. Both of those doctrines prohibit CMS from supplanting Congress's work by unilaterally revising portions of the Medicare statute.

Whether the short-term savings associated with MFN pricing are worth the long-term costs of diminished research and development and lost patient access to innovative therapies is a judgment call reserved for Congress, subject to constitutional constraints. And Congress has

decided that mandatory MFN-based price controls do not serve the national interest. Allowing CMS to override Congress's choices to purportedly "test" a "payment [or] service delivery model[]" would be an unprecedented expansion of agency authority and an unacceptable diminution of Congress's prerogative to make the laws. And CMS's power grab would not end there: Future Administrations would have every incentive to use an unbounded Section 1115A power to advance their own health-policy priorities without legislative approval. Neither Section 1115A nor the Constitution permits that usurpation of the lawmaking role. This Court should hold GLOBE unlawful and set it aside.

## BACKGROUND

### A. Section 1115A of the Social Security Act

The Centers for Medicare & Medicaid Services (CMS) is an agency within the Department of Health and Human Services that is responsible for administering the Medicare program. Section 1115A of the Social Security Act created a subagency within CMS called the Center for Medicare and Medicaid Innovation (CMMI), 42 U.S.C. § 1315a(a)(1). CMMI's charge is narrow and specific. It may "test innovative payment and service delivery models to reduce program expenditures" in the Medicare and Medicaid programs—"while preserving or enhancing the quality of care furnished to individuals under such subchapters." *Id.*

In creating CMMI, Congress imposed numerous limitations on the agency's authority. Most obviously, Congress has limited CMMI to conducting experiments ("tests") to see how different ways of providing healthcare services and paying for those services ("innovative payment and service delivery models") affect Medicare or Medicaid expenditures. The statute does not permit CMMI to displace Congress's choices about Medicare or even to try to save money in ways that do not involve testing innovative models for structuring payment and delivering healthcare.

The statute also requires that CMMI comply with a two-phase procedure for testing

payment and service delivery models. In Phase I, CMMI must "test payment and service delivery models . . . to determine the effect of applying such models . . . on program expenditures . . . and the quality of care" received by beneficiaries. 42 U.S.C. § 1315a(b)(1). The only models that CMMI may test are ones for which there is "evidence that the model addresses a defined population for which there are deficits in care leading to poor clinical outcomes or potentially avoidable expenditures." *Id.* § 1315a(b)(2)(A). The statute provides an illustrative list of models that may be tested, including models that "transition primary care practices away from fee-for-service based reimbursement and toward comprehensive payment or salary-based payment" and that "align[] nationally recognized, evidence-based guidelines of cancer care with payment incentives." *Id.* § 1315a(b)(2)(B). As part of Phase I, CMMI must also "conduct an evaluation of each model tested," including an analysis of "(i) the quality of care furnished under the model"; and "(ii) the changes in spending . . . by reason of the model." *Id.* § 1315a(b)(4)(A). Unless a model is expected to "improve the quality of care"; "reduce spending . . . without reducing the quality of care"; or "improve the quality of care and reduce spending," CMMI "shall terminate or modify" the model. *Id.* § 1315a(b)(3)(B).

Models that satisfy at least one of those criteria are eligible for Phase II: "[e]xpansion of models." In Phase II, CMMI "may, through rulemaking, expand (including implementation on a nationwide basis) the duration and the scope of a model" if it finds that doing so will "reduce spending . . . without reducing the quality of care" or "improve the quality of care without increasing spending." 42 U.S.C. § 1315a(c)(1). CMMI may not expand a model unless it determines "that such expansion would not deny or limit the coverage or provision of benefits under [Medicare or Medicaid] for applicable individuals." *Id.* § 1315a(c)(3).

As part of its Phase I testing, CMMI "may waive such requirements" of the Medicare

statute (as well as portions of the Medicaid statute and certain provisions that generally grant authority to HHS) "as may be necessary solely for purposes of carrying out this section with respect to testing models." 42 U.S.C. § 1315a(d)(1). CMMI cannot add requirements to Medicare and Medicaid, nor may it waive Medicare and Medicaid provisions once a model enters Phase II.

Since its creation, CMMI has tested dozens of models using its Section 1115A authority. Those models closely resemble the illustrative models that Congress outlined in the statute: They try to promote higher quality, more cost-effective care by shifting from flat-fee or fee-for-service payment structures to payment structures linked to outcomes or performance. *See infra* at 21-24.

**B. Medicare Part B**

The Medicare program "is a federally funded medical insurance program for the elderly and disabled." *Fischer v. United States*, 529 U.S. 667, 671 (2000). The rule at issue in this litigation purports to make changes to Medicare Part B, which is part of the "Original Medicare" program and creates an optional CMS-run program that covers non-hospital doctor's visits, outpatient hospital services, and other outpatient care, including certain prescription drugs. 42 U.S.C. §§ 1395j to 1395w-6. As relevant here, Part B covers "medical and other health services," *id.* § 1395k(a)(1), which include "drugs and biologicals which are not usually self-administered by the patient" and are "furnished as an incident to a physician's professional service," *id.* § 1395x(s)(2)(A); *see id.* § 1395x(s)(2)(B). Many Part B drugs are innovative, complex biologics, including novel cancer treatments and immunotherapies.

Medicare Part B employs a "buy and bill" system, under which healthcare providers purchase drugs from manufacturers or other suppliers, furnish them to beneficiaries, and then seek reimbursement from CMS. By statute, under a framework Congress enacted more than 20 years ago, the amount of reimbursement providers are entitled to receive for a particular drug under Part B generally is tied to its "average sales price." 42 U.S.C. §§ 1395u(o)(1)(C), 1395w-3a. The

average sales price is determined based on "sales to all purchasers . . . in the United States for such drug or biological in the calendar quarter," with exceptions not relevant here, net of certain discounts. *Id.* § 1395w-3a(c)(1). Congress chose the average sales price because it wanted Part B covered drugs to be reimbursed at rates approximating "the actual price paid by purchasers" in "real market transaction[s]." H.R. Rep. 108-178, pt. 2, at 194, 197-98 (2003). In Congress's view, Medicare should "base[] its payments on prices that . . . reflect prices otherwise available through market incentives." *Id.* at 197.

Over the years, Congress has considered overhauling Medicare drug pricing by incorporating MFN pricing into Medicare's market-based pricing regime. All of the proposed bills failed—indeed, most of them never made it out of committee. *See, e.g.*, Medicare Drug Price Negotiation Act, H.R. 4138, 115th Cong. (2017); Medicare Drug Price Negotiation Act, S. 2011, 115th Cong. (2017); Medicare Negotiation and Competitive Licensing Act of 2018, H.R. 6505, 115th Cong. (2018); Elijah E. Cummings Lower Drug Costs Now Act, H.R. 3, 116th Cong. (2019).

### C. The Challenged GLOBE Rule

Through GLOBE, CMS now seeks to cast aside Congress's choice of market-based pricing for Medicare Part B drugs and replace it with MFN pricing. GLOBE would foist MFN pricing upon the American market by purporting to "test" an "innovative payment and service delivery model" under Section 1115A. That "test" would require manufacturers participating in Medicare Part B to pay "rebates" pegged to an MFN "benchmark" calculated based on the prices in 19 other countries, which would cap how much a manufacturer receives for Medicare sales. In other words, GLOBE would impose foreign price controls under the guise of "testing" a rebate scheme.

GLOBE's price controls would apply to all Part B-covered drugs that meet certain criteria, subject to limited exceptions. The drugs must fall into categories that "were responsible for most [Original Medicare] Part B spending (91 percent)" in 2024—including "drugs used to treat cancer

and related conditions, rheumatoid arthritis and other immune mediated conditions, and macular degeneration and other serious eye conditions." 91 Fed. Reg. at 62,973. Each drug must also result in Part B expenditures greater than a defined "minimum spend threshold over a 12-month period," with the annual threshold initially set at $100 million but subject to adjustments for inflation in the future. *Id.* at 62,973, 63,104. And the drugs must be "single source drugs or sole source biological products" for which there is no equivalent product sold or marketed in the United States. *Id.* at 62,973. GLOBE codifies narrow exceptions for certain drugs used to treat only rare diseases, cell and gene therapy drugs, and plasma-derived drugs. *Id.* at 62,947.

The rule also references an additional, uncodified exemption. Earlier this year, CMS launched the GENErating cost Reductions fOr U.S. Medicaid (GENEROUS) model, under which manufacturers could agree to MFN-style pricing in the Medicaid (not Medicare) program in exchange for negotiated coverage criteria.[1] CMS claimed "that a manufacturer's participation in the GLOBE Model could impact CMS's ability to isolate the effects of the GENEROUS Model." 91 Fed. Reg. at 63,070. It therefore announced that it "intends to use its authority" to exempt GENEROUS participants from GLOBE's mandatory participation requirements in exchange for their "voluntary MFN commitments." *Id.* at 63,070, 63,082. But the agency "decline[d] to codify" those exemptions or commit to maintaining them for GLOBE's full duration. *Id.* at 63,070. The rule also indicates that such exemptions, if applied, would be limited to calendar quarters during which a manufacturer would be subject to GLOBE and is participating in GENEROUS, *id.*, and GENEROUS currently is scheduled to conclude before GLOBE would end.

Manufacturers of drugs that meet CMS's criteria and do not fall within an exemption would

[1] CMMI, *GENEROUS (GENErating cost Reductions fOr U.S. Medicaid) Model*, https://www.cms.gov/priorities/innovation/innovation-models/generous.

be required to participate in GLOBE. The rule explains that "mandatory participation is necessary" because "manufacturers would likely not volunteer to participate, given that the model's rebate mechanism reduces their effective reimbursement." 91 Fed. Reg. at 62,985. Even manufacturers who play no role in setting prices for drugs in other countries are swept into GLOBE. Although CMS recognized that there are many drugs "where the U.S. manufacturer may not be the same entity that is responsible for sales in other countries," it declined to permit such manufacturers to "qualify for a model exemption." *Id.* at 62,984.

CMS is also imposing the GLOBE "model" on tens of millions of Medicare enrollees—approximately 25% of all Original Medicare Part B beneficiaries. 91 Fed. Reg. at 62,938. Which of those Original Medicare Part B beneficiaries are enlisted for GLOBE depends solely on whether they live in a set of randomly chosen "ZIP Code Tabulation Areas." *Id.* Like covered manufacturers, covered beneficiaries are not permitted to opt out of GLOBE.

A key building block of GLOBE's MFN-pricing regime is the foreign reference price (or "GLOBE Model benchmark"). 91 Fed. Reg. at 63,107. CMS plans to determine the foreign reference price for each covered drug based on "international drug pricing information." *Id.* at 62,939. Specifically, CMS would examine drug prices in 19 countries: Australia, Austria, Belgium, Canada, Czech Republic, Denmark, France, Germany, Ireland, Israel, Italy, Japan, the Netherlands, Norway, South Korea, Spain, Sweden, Switzerland, and the United Kingdom. *Id.*

Using drug pricing information from those 19 countries, CMS would calculate the foreign reference price for each covered drug using one of two methods. The first and default method would look to the lowest per-unit country-level price for the drug in any one of the 19 GLOBE Model reference countries. 91 Fed. Reg. at 62,939. The second method—which would be available only to manufacturers who collect (to the extent they are even able to do so) and submit

detailed, confidential data about the net foreign pricing of the drug's "applicable international analogs"—would look to the across-country weighted average of net pricing for sales across a set of CMS's chosen GLOBE Model reference countries. *Id.* at 62,939, 63,033. The higher of the two prices, subject to adjustments for GDP and certain other factors, would be the relevant foreign reference price, or GLOBE Model international "benchmark amount." *Id.* at 63,024.

Given the structure of Medicare Part B—whereby CMS disburses money to healthcare providers who purchase drugs—CMS could not impose MFN pricing on manufacturers simply by cutting reimbursements. Instead, GLOBE rewrites Congress's Medicare Part B "inflation rebate" system to prevent manufacturers from recovering more than the foreign reference price on certain Part B sales. 91 Fed. Reg. at 62,938. In enacting the Inflation Reduction Act (IRA), Pub. L. No. 117-169, 136 Stat. 1818 (2022), Congress created an "inflation rebate" applicable to drugs whose prices rose faster than the rate of inflation. *See* 42 U.S.C. § 1395w-3a(i). GLOBE would replace that congressionally approved rebate calculation with a calculation based on the delta between the foreign reference price and the statutory payment rate. 91 Fed. Reg. at 62,938. If the inflation rebate is greater than the GLOBE-required rebate, then the inflation rebate would apply. *Id.* The GLOBE-mandated payments would be deposited directly into CMS's own "Federal Supplementary Medical Insurance Trust Fund." *Id.* at 63,100. GLOBE requires manufacturers to pay those rebates on a quarterly basis, under pain of significant monetary penalties. *Id.* at 63,116.

GLOBE is not CMS's first effort to circumvent Congress by unilaterally instituting MFN pricing. In 2020, CMS issued an interim final rule that sought to impose MFN pricing for specified Medicare Part B drugs. CMS, Most Favored Nation (MFN) Model, 85 Fed. Reg. 76,180, 76,181 (Nov. 27, 2020). Relying on Section 1115A, CMS purported to "waive" the provision that tied reimbursements to those drugs' average sales price and to instead calculate reimbursements using

"drug pricing information" from a collection of Organisation for Economic Co-operation and Development (OECD) countries. *Id.* at 76,200, 76,258.

Before that Most Favored Nation rule took effect, however, the United States District Court for the District of Maryland entered a nationwide temporary restraining order that prohibited the agency from enforcing the rule. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 488 (D. Md. 2020). The court reasoned that CMS had failed to use the required notice-and-comment rulemaking process, and that no "good cause" justified that failure. *See id.* at 494-96. The court also concluded that the plaintiffs would suffer irreparable harm from the rule. *Id.* at 499-500. Within a week, two other courts issued similar orders. *See Cal. Life Scis. Ass'n v. CMS*, No. 20-cv-08603, 2020 WL 7696050, at *1 (N.D. Cal. Dec. 28, 2020); *Regeneron Pharms., Inc. v. HHS*, 510 F. Supp. 3d 29, 35 (S.D.N.Y. 2020). A year later, CMS rescinded the never-effective rule. CMS, Most Favored Nation (MFN) Model, 86 Fed. Reg. 73,986 (Dec. 29, 2021).

CMS publicly announced GLOBE on December 21, 2025, and published a Notice of Proposed Rulemaking (NPRM) in the Federal Register two days later. *See* Global Benchmark for Efficient Drug Pricing (GLOBE) Model, 90 Fed. Reg. 60,244 (Dec. 23, 2025).[2] A diverse array of organizations, including Plaintiff, submitted comments opposing GLOBE on the grounds that it exceeds CMS's statutory authority and would hurt American patients, businesses, and global leadership. Undeterred, CMS announced the GLOBE Final Rule on September 30, 2026, and published it in the Federal Register on October 2. The Final Rule makes only modest modifications to the NPRM and fails to address the serious objections lodged against GLOBE.

GLOBE is scheduled to take effect on November 30, 2026. 91 Fed. Reg. at 62,937. Its

---

[2] The same day it announced GLOBE, CMS also announced a different NPRM, Guarding U.S. Medicare Against Rising Costs (GUARD), which would impose MFN pricing in Medicare Part D. *See* 90 Fed. Reg. 60,338 (Dec. 23, 2025). CMS has not yet finalized the GUARD rule.

period for collecting "voluntary manufacturer-submitted international drug pricing data" will begin on January 1, 2027. *Id.* at 62,937. Its "performance period" will run for five years, beginning on April 1, 2027, and running through March 31, 2032. *Id.* Because of lag time in calculating and receiving rebate payments, CMS anticipates that manufacturers will be paying GLOBE rebates through the first quarter of 2034. *Id.*

CMS estimates that GLOBE's economic impact will be $440 million over the seven-year payment period. 91 Fed. Reg. at 63,088, 63,089 tbl.13. That figure is sharply down from the $11.9 billion that CMS originally estimated, *see* 90 Fed. Reg. at 60,313 tbl.13, largely because of the "assum[ption] that manufacturers that have signed GENEROUS Model participation agreements" will be exempted from "mandatory participation" in GLOBE, 91 Fed. Reg. at 63,072.

### D. The Present Controversy

Plaintiff Pharmaceutical Research and Manufacturers of America (PhRMA) is a nonprofit association representing the country's leading research-based pharmaceutical and biotechnology companies. PhRMA's members are devoted to discovering and developing new medications that allow people to live longer, healthier, and more productive lives. Over the last decade, PhRMA members have invested more than $900 billion in the search for new treatments and cures, including $110 billion in 2025 alone. *See* Dkt. No. 1 (Compl.) ¶ 25.

PhRMA's members will be adversely affected by the rule. GLOBE will force PhRMA members who sell Medicare Part B drugs covered by the rule to pay hundreds of millions of dollars in "rebates" over a seven-year period. 91 Fed. Reg. at 63,089 tbl.13; *see* Exh. A, ¶¶ 16-18; Exh. C, ¶¶ 12-15. That reduced revenue, and the broader uncertainty created by GLOBE, will require PhRMA's members to decrease investment in research and development in the U.S. pharmaceutical market. *See* Exh. A, ¶¶ 19-23; Exh. B, ¶ 12; Exh. D, ¶¶ 9-10; Exh. E, ¶¶ 8-11; Exh. F, ¶¶ 4-7, 14-16; Exh. H, ¶¶ 4-6, 14. That reduced investment, in turn, will limit PhRMA

members' ability to develop novel and lifesaving drugs and biologics. *See* Exh. A, ¶¶ 19-30; Exh. D, ¶ 10; Exh. E, ¶¶ 11-12; Exh. F, ¶¶ 16-19; Exh. H, ¶ 14. GLOBE's adverse effects will not be limited to PhRMA members who currently sell drugs subject to GLOBE. Other PhRMA members may fall within GLOBE's ambit in the future, as their drugs grow in market share or as the scope of the program changes. *See, e.g.*, Exh. D, ¶ 9; Exh. E, ¶¶ 7, 10; Exh. F, ¶ 13; Exh. G, ¶ 6; Exh. H, ¶ 12. And even those PhRMA members that do not sell Part B products subject to GLOBE strongly oppose efforts to mandate foreign-drug pricing that displaces the United States' market-based approach and thereby threatens innovation. *See* Exh. D, ¶¶ 6-15; Exh. E, ¶¶ 5-12; Exh. F, ¶¶ 14-20; Exh. G, ¶¶ 7-8; Exh. H, ¶¶ 11-14.

On October 7, PhRMA filed this action under the Administrative Procedure Act (APA), challenging CMS's statutory and constitutional authority to issue GLOBE. *See* Dkt. No. 1. The parties agreed to a briefing schedule, with PhRMA requesting a ruling from this Court by March 1, 2027. On November 2, 2026, the Court approved the parties' briefing schedule. *See* Dkt. 20.

## LEGAL STANDARD

"When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *United Space All., LLC v. Solis*, 824 F. Supp. 2d 68, 78 (D.D.C. 2011) (Lamberth, J.) (citation modified). "The 'entire case' on review is a question of law." *Id.* (citation omitted). Summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'" *Fisher v. PBGC*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (citation omitted).

## ARGUMENT

The APA authorizes courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations" or that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B)-(C). GLOBE is unlawful because Congress did not—and constitutionally

could not—authorize CMS to unilaterally remake the Nation's drug-pricing policy. This Court should therefore vacate the rule in full. *See Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) ("When an agency's action is unlawful, vacatur is the normal remedy.").

## I. GLOBE EXCEEDS CMS'S STATUTORY AUTHORITY.

GLOBE is unlawful for a straightforward reason: Congress has not given CMS statutory authority to mandate MFN pricing by regulation. That conclusion follows directly from the major questions doctrine, which requires clear congressional authorization where—as here—an agency claims a previously unrecognized power to transform an important sector of the American economy. And GLOBE's illegality equally follows from the plain text of the statute, which does not authorize (much less clearly authorize) CMS's overhaul of Medicare drug pricing.

Whether Section 1115A authorizes GLOBE—an attempt by a subagency within CMS to unilaterally impose price controls that will stifle biopharmaceutical innovation and create barriers to patient access to medicines—qualifies as a major question. By CMS's own estimate, GLOBE carries a $440 million price tag. But the full economic impact of CMS's claimed authority—and GLOBE's actual costs in lost innovation—are far greater. How best to address drug prices is a politically contentious topic that Congress has debated for years. Indeed, Congress has repeatedly considered and declined to enact bills that would have implemented MFN pricing schemes like GLOBE's. Furthermore, GLOBE is an unprecedented exercise of CMS's authority: Aside from one prior attempt to institute MFN pricing that was swiftly quashed in court, CMS has never before interpreted Section 1115A to give it such sweeping power. By any measure, this is a major questions case. So CMS must point to clear congressional authorization to support its rule.

Section 1115A falls far short of that standard—indeed, it cannot supply even a "plausible textual" basis for CMS's power grab. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Section 1115A is a "minor" and "ancillary"

provision of the Affordable Care Act that merely authorizes CMMI to "test" whether "innovative payment and service delivery models" will save the government money while preserving or enhancing quality of care. *NFIB v. Sebelius*, 567 U.S. 519, 704-05 (2012) (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting); *see* 42 U.S.C. § 1315a(a). GLOBE flunks virtually every element of Section 1115A's text: GLOBE does not "test" whether MFN pricing will reduce Medicare spending—its mandatory rebates preordain that result. GLOBE is not an "innovative . . . payment model"—it simply slashes U.S. drug prices to foreign levels. GLOBE's indiscriminate application prevents it from satisfying Section 1115A's requirement that it address "a defined population with deficits in care." And GLOBE's reliance on a limited "waiver" authority to "red pencil" the IRA and the Medicare Act directly contravenes Supreme Court precedent. *Biden v. Nebraska*, 600 U.S. 477, 499 (2023).

Section 1115A is not the only statute that GLOBE violates. The rule independently transgresses a statute barring reliance on the discriminatory metric of quality adjusted life years (QALYs) in Medicare decision-making. And it defies the federal appropriations laws by augmenting CMS's funds without congressional approval. GLOBE thus exceeds the agency's statutory authority many times over.

### A. GLOBE Triggers the Major Questions Doctrine.

Because Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001), the Supreme Court has "long expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 242 (2026) (opinion of Roberts, C.J.) (quoting *West Virginia*, 597 U.S. at 723). For instance, it has "declined to read authorization to 'waive or modify' statutory or regulatory provisions applicable to financial assistance programs as a delegation of power to cancel $430 billion in student loan debt," *id.* (quoting *Nebraska*, 600 U.S. at 494); "declined to

read authorization to determine the 'best system of emission reduction' as a delegation of power to force a nationwide transition away from the use of coal," *id.* (quoting *West Virginia*, 597 U.S. at 732); and "declined to read authorization to ensure 'safe and healthful working conditions' as a delegation of power to impose a vaccine mandate on 84 million Americans," *id.* (quoting *NFIB v. OSHA*, 595 U.S. 109 (2022)). The lesson of those "'major questions' cases" is that "Congress would not have delegated 'highly consequential power' through ambiguous language." *Id.* at 243 (quoting *West Virginia*, 597 U.S. at 723-24).

CMS's attempt to mandate MFN pricing through GLOBE has all the hallmarks of a major questions case. Whether the U.S. prescription-drug market should be subject to government price controls is an issue of vast economic and political significance; Congress reserves for itself significant decisions about Medicare drug pricing and has specifically considered and rejected mandatory MFN pricing; and GLOBE represents an unprecedented use of CMMI's authority.

**1. GLOBE is a matter of "vast economic and political significance."**

Whether the price of prescription drugs, including in the Medicare program, should be artificially suppressed through government intervention is a question of immense "economic and political significance." *Learning Res.*, 607 U.S. at 246 (opinion of Roberts, C.J.) (quoting *West Virginia*, 597 U.S. at 721). CMS itself estimates that GLOBE will decrease Medicare Part B spending by $440 million over the next seven years. 91 Fed. Reg. at 63,089 tbl.13. And that figure massively understates the economic impact of CMS's claimed authority. In its proposed rule, CMS estimated that GLOBE would reduce Medicare Part B expenditures by nearly $12 billion. 90 Fed. Reg. at 60,246. The agency arrived at a reduced (but still large) figure in the rule primarily by removing from its estimate the companies that CMS "intends to" exempt from GLOBE due to their participation in GENEROUS. 91 Fed. Reg. at 63,070. But those exemptions are not codified in the rule itself, and CMS could attempt to revoke them. *See id.* Moreover, CMS only "intends"

to grant GLOBE exemptions for "calendar quarter[s]" during which a manufacturer participates in GENEROUS, which is set to expire at the end of 2030, well before GLOBE's performance period ends. *Id.* Thus, GLOBE's economic impact could easily reach into the billions of dollars.

In other words, CMS cannot escape the major questions doctrine by artificially deflating GLOBE's initial price tag through discretionary exemptions. After all, the doctrine looks to the full implications of "the Government's claimed authority," not how the agency promises to use such authority for the time being. *West Virginia*, 597 U.S. at 728-29. Under CMS's interpretation of Section 1115A, there is no meaningful limit on the economic magnitude of rebate obligations the agency could impose. Indeed, the proposed GUARD rule—which rests on the same interpretation of Section 1115A as GLOBE—is estimated to have a $14 billion impact on Medicare Part D spending over 7 years. 90 Fed. Reg. at 60,409.

In *King v. Burwell*, 576 U.S. 473 (2015), the Supreme Court concluded there was "reason to hesitate" before accepting HHS's claimed authority because the case involved "billions of dollars" in healthcare spending and affected "the price of health insurance for millions of people," *id.* at 485. Similarly, GLOBE will impact hundreds of millions, and likely billions, of dollars in healthcare spending in a program that millions of Americans depend on for coverage of critically important drugs. And those vast sums will be deposited straight into a CMS account, allowing the agency to augment its appropriations without consulting Congress. The "considerations" behind the major questions doctrine "apply with particular force where, as here . . . the core congressional power of the purse" is implicated. *Learning Res.*, 607 U.S. at 243 (opinion of Roberts, C.J.).

The economic ramifications of GLOBE, moreover, will extend far beyond its direct impact on Medicare Part B spending. GLOBE threatens to chill billions of dollars of investment in pharmaceutical research and development. The average cost of developing one new drug—

accounting for the time- and resource-intensive nature of scientific research and clinical testing, as well as failed alternatives and opportunity costs—is approximately $3 billion.[3] Accordingly, pharmaceutical companies can afford to invest in research and development only when they expect to receive significant returns on the few drugs that survive the gauntlet of FDA approval and reach the market.[4] CMS itself acknowledges that "pharmaceutical R&D incentives are strongly shaped by expected commercial returns, patent and exclusivity rules, and risk-adjusted profitability." 91 Fed. Reg. at 62,955. Congress's choice to tie the price of Medicare Part B drugs to their average sales price in a competitive market has allowed U.S. pharmaceutical manufacturers to invest hundreds of billions of dollars into discovering, developing, and testing innovative drugs and biologics. Government-imposed price controls like GLOBE have the opposite effect: They artificially limit the returns that manufacturers receive on marketed drugs, thereby choking off the revenue stream necessary to sustain research and development.

The political salience of prescription-drug pricing is likewise difficult to overstate. How best to address rising out-of-pocket costs for prescription drugs has "been the subject of an earnest and profound debate across the country." *West Virginia*, 597 U.S. at 732 (citation omitted). President Trump recognized the importance of the issue by choosing to highlight drug-pricing reform in this year's State of the Union address.[5] President Biden likewise emphasized drug pricing in public addresses, giving an entire speech titled "Remarks on Efforts To Reduce

---

[3] Joseph A. DiMasi et al., *Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J. Health Econ. 20, 25-26 (2016).
[4] Congressional Budget Office, *Research and Development in the Pharmaceutical Industry* (Apr. 2021), https://www.cbo.gov/publication/57126.
[5] TIME Staff, *Read Donald Trump's Full State of the Union Speech* (Feb. 25, 2026), https://time.com/7381059/donald-trump-state-of-the-union-full-speech-transcript.

Prescription Drug and Health Care Costs."[6] And in 2025, 29% of Americans ranked the cost of healthcare as the "most urgent health problem" facing the country, up from 23% the year before.[7] "The basic and consequential tradeoffs involved" in deciding how to balance drug costs with patient outcomes, long-term healthcare costs, and incentives for pharmaceutical innovation "are ones that Congress would likely have intended for itself"—and that the American people would expect their representatives in Congress, not an obscure subagency within CMS, to make. *West Virginia*, 597 U.S. at 730.

**2. GLOBE is inconsistent with congressional practice.**

"[C]ongressional practice confirms" that whether to restructure Medicare drug pricing by mandating MFN pricing is a decision that Congress would keep for itself. *Learning Res.*, 607 U.S. at 243 (opinion of Roberts, C.J.). Indeed, Congress has "considered and rejected" GLOBE's foreign-pricing policy "multiple times." *West Virginia*, 597 U.S. at 731 (citation omitted). In 2017, for example, a bill was proposed in the House of Representatives that gave CMS authority to tie the prices of certain drugs in the United States to the prices at which those drugs were sold abroad, authorizing a policy similar to GLOBE. Medicare Drug Price Negotiation Act, H.R. 4138, 115th Cong. (2017). But the bill never made it out of the House Subcommittee on Health. Numerous similar bills have also failed to pass Congress. *See supra* at 7. Consequently, CMS is asserting authority that would "'conveniently enable [it] to enact a program' that Congress has chosen not to enact itself." *Nebraska*, 600 U.S. at 503 (quoting *West Virginia*, 597 U.S. at 731). CMS responds that GLOBE does not "implement the international reference pricing provisions

[6] Joseph R. Biden Jr., Remarks on Efforts To Reduce Prescription Drug and Health Care Costs (Aug. 29, 2023), http://presidency.ucsb.edu/documents/remarks-efforts-reduce-prescription-drug-and-health-care-costs.

[7] Lydia Saad & Megan Brenan, *Cost Leads Americans' Top-of-Mind Healthcare Concerns*, Gallup (Dec. 15, 2025), https://news.gallup.com/poll/699770/cost-leads-americans-top-mind-healthcare-concerns.aspx.

that Congress considered and did not adopt in the context of the Negotiation Program." 91 Fed. Reg. at 62,953. But the fact that GLOBE does not replicate the precise provisions that Congress declined to enact does not diminish the import of Congress's repeated rejection of the overall policy of foreign-reference pricing.

GLOBE's MFN pricing regime, moreover, is a barely veiled attempt to directly dictate the rates manufacturers can charge for Medicare Part B drugs. But "[i]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion." *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 (1994). "'[A] reasonable interpreter would [not] expect' Congress to 'pawn[]' such a 'big-time policy call[] off to another branch.'" *Learning Res.*, 607 U.S. at 246 (opinion of Roberts, C.J.) (quoting *Nebraska*, 600 U.S. at 515 (Barrett, J., concurring)). In fact, Congress has already made this particular decision, declaring in the Medicare statute that Part B drug pricing should be based on the "average sales price," not government rate setting. *See* 42 U.S.C. §§ 1395u(o)(1)(C), 1395w-3a. As a matter of "common sense," *Learning Res.*, 607 U.S. at 243 (opinion of Roberts, C.J.), Congress would not have specified that, with narrow exceptions, Part B drugs generally should be reimbursed at the price they command on the open market only to then grant CMMI the authority to eviscerate market-based pricing in the name of "test[ing] . . . models."

Indeed, when Congress has resolved to make significant changes to the Medicare drug-pricing regime, it has done so "in explicit terms." *Learning Res.*, 607 U.S. at 231 (opinion of Roberts, C.J.). In 2022, after many years of debate, Congress enacted measures to address the cost of prescription drugs in the IRA. Congress was aware of, but did not select, MFN pricing as one of those measures. Instead, it adopted two programs that deviate from market pricing in limited circumstances. *See* 42 U.S.C. §§ 1320f-3, 1395w-3a(i)(3). As discussed above, one is a rebate

program "for certain drugs with prices increasing faster than inflation." *Id.* § 1395w-114b; *see supra* at 10. The second program is a so-called "negotiation" program, which directs CMS to annually select between 10 and 20 drugs each year and "achieve the lowest maximum fair price for each selected drug." *Id.* § 1320f-3.

GLOBE would scrap the decisions that Congress made in the IRA. It would "waive" the inflation-based rebate amount Congress specified and replace it with a different amount of CMS's own preference. And it would "achieve the lowest" possible price for a wide range of drugs—not just the particular drugs selected by the IRA—through government mandate rather than through "negotiation." GLOBE, in essence, takes legislation that Congress passed and replaces it with different legislation that Congress has repeatedly considered and failed to pass.

**3. GLOBE is an unprecedented exercise of CMMI's authority.**

GLOBE is also an assertion of "'unheralded' regulatory power" that admits of no limiting principle. *West Virginia*, 597 U.S. at 722 (quoting *Util. Air*, 573 U.S. at 324). It is "telling that in" CMMI's entire existence, it has virtually never invoked Section 1115A to impose a "model" of "this magnitude and scope." *Learning Res.*, 607 U.S. at 245 (opinion of Roberts, C.J.). The typical Section 1115A model alters payment structures, such as by switching from fee-for-service to incentive-based payments in an effort to test whether that switch leads to higher quality and more efficient care. GLOBE does nothing of the sort. Instead, it bluntly caps the amount manufacturers may earn under Medicare Part B for developing and supplying vital drugs. GLOBE is also atypical in making participation mandatory rather than voluntary. The fact that CMS has never before found in Section 1115A the power to impose punishing price controls with billion-dollar effects is "strong evidence that it does not exist." *Learning Res.*, 607 U.S. at 250.

GLOBE is different in kind, not just degree, from predecessor CMMI models—which is no doubt why CMS admits that GLOBE "represents a novel application of CMS Innovation Center

authority under section 1115A of the Act." 91 Fed. Reg. at 62,946; *see id.* at 63,079 (similar). The standard Section 1115A model tests incentive-based payments to assess potential improvements in patient care and cost efficiency. For example, the Enhancing Oncology Model invites oncology providers to participate in an effort to improve quality, coordination, and cost of care for "Medicare beneficiaries receiving systemic chemotherapy for seven specific cancers."[8] It does so by shifting "fee-for-service reimbursement" to "episode-based payment." 91 Fed. Reg. at 62,951. Similarly, the voluntary Kidney Care Choices Model "aims to delay the onset of dialysis and incentivize kidney transplantation" for Medicare beneficiaries with late-stage chronic kidney disease and end-stage renal disease through alternative payment models.[9] Under one payment option, providers "receive capitation payments," which means they "take responsibility for the total cost and quality of care for their patients, and in exchange, can receive a portion or all of the Medicare savings they achieve."[10] Under another payment option, providers receive payments "adjusted based on health outcomes" and "performance on quality measures," and can also "receive a bonus payment for every aligned beneficiary who receives a kidney transplant."[11] GLOBE, by contrast, does not offer a new payment structure to incentivize best practices—it simply dictates a cap on amounts that manufacturers can receive for Part B drugs.

GLOBE also strays from the norm in that it gives manufacturers no choice over whether to participate. The overwhelming majority of Section 1115A models are fully voluntary for participants. *See* GAO-26-107953, *CMS Innovation Center: Obligations and Model Payments* 15

[8] CMMI, *EOM (Enhancing Oncology Model)*, https://www.cms.gov/priorities/innovation/innovation-models/eom.

[9] CMMI, *KCC (Kidney Care Choices) Model*, https://www.cms.gov/priorities/innovation/innovation-models/kidney-care-choices-kcc-model.

[10] *Id.*

[11] *Id.*

(Mar. 2026) (noting that, of 24 currently active models, "22 models had voluntary participation"). That is likely because most models offer some upside for participants, like the potential to earn additional payments for positive outcomes, thereby attracting volunteers. GLOBE, meanwhile, is all downside for manufacturers, forcing CMS to acknowledge that "manufacturers would likely not volunteer to participate." 91 Fed. Reg. at 62,985.

Even CMMI's prior mandatory models operate similarly to the standard voluntary model by altering payment structures to create better incentives. For example, the ASM (Ambulatory Specialty Model) encourages early intervention for patients at risk of heart failure using "two-sided risk arrangements" under which providers receive a "positive payment adjustment" or a "negative risk adjustment" based on "performance."[12] Under the CJR (Comprehensive Care for Joint Replacement) Model, providers could "receive[] an additional payment from Medicare or . . . be[] required to repay Medicare for a portion" of previous payments, depending on the "quality" of their "performance."[13] TEAM (Transforming Episode Accountability Model) allows selected acute care hospitals to "earn a payment from CMS" or "owe CMS a repayment amount" based on patient outcomes.[14] The remaining mandatory models are of a piece. *See* Compl. ¶ 84 (collecting examples). CMS has not pointed to any regulatory antecedent that mandates participation and necessarily reduces the amount of payment, rather than creating both potential upside and downside for participants.

Reading Section 1115A to authorize GLOBE, despite its sharp deviation from past Section

---

[12] CMMI, *ASM (Ambulatory Specialty Model)*, https://www.cms.gov/priorities/innovation/innovation-models/asm.
[13] CMMI, *CJR (Comprehensive Care for Joint Replacement) Model*, https://www.cms.gov/priorities/innovation/innovation-models/cjr.
[14] CMMI, *TEAM (Transforming Episode Accountability Model)*, https://www.cms.gov/priorities/innovation/innovation-models/team-model.

1115A models, would "bring about an enormous and transformative expansion" in CMS's authority. *Util. Air*, 573 U.S. at 324. It would turn CMMI from a small subagency dedicated to experimenting with incentive programs to a powerful regulatory body on the level of the United Kingdom's National Health Service. And CMS, acting through CMMI, would "enjoy virtually unlimited power" to set the price of Medicare Part B drugs. *Nebraska*, 600 U.S. at 502. If CMS can impose price controls with reference to a basket of foreign prices, then there is seemingly no limit to what it could do to advance a future Administration's healthcare priorities, regardless of whether those priorities are shared by the Legislative Branch. "The 'lack of historical precedent'" for GLOBE, "'coupled with the breadth of authority' that [CMS] now claims, 'is a telling indication'" that GLOBE "extend[s] beyond [CMS's] 'legitimate reach.'" *Learning Res.*, 607 U.S. at 245-46 (opinion of Roberts, C.J.) (quoting *NFIB v. OSHA*, 595 U.S. at 119).

**4. CMS's efforts to escape the major questions doctrine fail.**

CMS claims that GLOBE does not present a major question because it is "time-limited" to seven years and applies to only a subset of the Medicare population in certain geographic areas and a subset of Medicare Part B drugs. 91 Fed. Reg. at 62,952. None of those features takes GLOBE outside the scope of the major questions doctrine.

To start, the Supreme Court has never suggested that agency action must last for an indefinite period of time to trigger the major questions doctrine. To the contrary, the Court has applied the doctrine to many policies that, like GLOBE, are of limited duration. The OSHA vaccine mandate was set to last for only six months. *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402, 61,461 (Nov. 5, 2021). The federal eviction moratorium was designed to expire after only four months. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 760 (2021); CDC, Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020). And the student-loan-forgiveness plan

called for a one-time cancellation of debt, not a permanent change to the student-borrower program. *Nebraska*, 600 U.S. at 488.

Likewise, GLOBE is not insulated from major questions treatment simply because it does not apply to *all* Medicare Part B beneficiaries or *all* Medicare Part B drugs. The OSHA vaccine mandate applied only to employers with at least 100 employees. *OSHA*, 595 U.S. at 113. The student-loan-forgiveness plan applied to only a subset of student borrowers with incomes below a threshold with certain kinds of eligible loans. *Nebraska*, 600 U.S. at 488. Nonetheless, the Supreme Court subjected both policies to major questions scrutiny. Those decisions make sense: The major questions doctrine focuses on "the Government's claimed authority," which is not tied to the term or scope of the particular policy under review. *West Virginia*, 597 U.S. at 728-29.

If CMS's claimed authority is upheld by the courts, then the agency will be free to try to extend GLOBE's reach, including by seeking to revoke the uncodified exemptions or attempting to "expand (including implementation on a nationwide basis) the duration and the scope of a model." 42 U.S.C. § 1315a(c). It could impose GLOBE's pricing mandates with respect to all Medicare Part B enrollees and drugs on an indefinite basis. *See* 91 Fed. Reg. 49,570, 50,128 (Aug. 4, 2026) (asserting that Section 1115A models need not have a "fixed end date"). The agency would also be emboldened to move forward with the GUARD rule, which imports the same foreign-reference pricing into Medicare Part D with roughly $14 billion in economic effects. 90 Fed. Reg. at 60,409. In short, upholding CMS's claimed authority would give the agency free rein to try to use Section 1115A to impose price controls throughout the Medicare program on an effectively permanent basis.

* * *

In sum, all the "telltale sign[s]" of a major question are present in GLOBE. *Nebraska*, 600

U.S. at 518 (Barrett, J., concurring). CMS must therefore "'point to clear congressional authorization' to justify [its] extraordinary assertion of the power" to reshape the American pharmaceutical industry and healthcare market through unilateral price controls. *Learning Res.*, 607 U.S. at 248 (opinion of Roberts, C.J.) (quoting *Nebraska*, 600 U.S. at 506).

**B. Section 1115A Does Not Authorize—Much Less Clearly Authorize—GLOBE.**

CMS cannot identify a tenable statutory basis for GLOBE. Section 1115A, the agency's sole claimed statutory basis for GLOBE, cannot bear the weight of CMS's "extravagant" assertion of authority. *Ala. Ass'n of Realtors*, 594 U.S. at 765 (citation omitted). Four Justices of the Supreme Court have explicitly described Section 1115A as a "minor" and "ancillary" provision. *NFIB*, 567 U.S. at 704-05 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). Buried within the nearly thousand-page Affordable Care Act (ACA), Section 1115A merely charged CMMI with "study[ing] . . . how to spend less government money," *id.*, by "test[ing] innovative payment and service delivery models," 42 U.S.C. § 1315a(a)(1). If Congress had granted a subagency of CMS the authority to unilaterally dictate Medicare drug prices, "[t]he last place one would expect to find it is in the" statutory "backwater" that is Section 1115A. *West Virginia*, 597 U.S. at 730.

The plain text confirms what common sense dictates. Even setting aside the major questions doctrine, Section 1115A refutes CMS's claimed authority: The statute's operative language—permitting CMMI to "test innovative payment and service delivery models to reduce program expenditures . . . while preserving or enhancing the quality of care"—does not grant CMS the authority to mandate MFN pricing in Medicare Part B. GLOBE does not "test" whether MFN pricing will "reduce program expenditures," and it cannot fairly be described as an "innovative payment and service delivery model." Instead, it unilaterally dictates that manufacturers pay a "rebate" with the preordained result of saving CMS money. GLOBE also fails to satisfy Section 1115A's requirement that the "model address[] a defined population for which there are deficits

in care": It addresses certain drugs that command high prices and are taken by a random subset of Original Medicare Part B beneficiaries who happen to live in certain ZIP codes. And GLOBE's comprehensive rewriting of the IRA's inflation-rebate provisions cannot be justified as an exercise of CMS's limited "waiver" authority. In other words, assessing GLOBE against each element of Section 1115A's text confirms that there is a fundamental "mismatch[]" between CMS's "broad 'invocation[] of power'" and the "relatively narrow" statutory provision upon which it relies. *Nebraska*, 600 U.S. at 517 (Barrett, J., concurring) (citation omitted).

**1. GLOBE is not a "test."**

To begin, GLOBE is not the kind of "test" permitted by Section 1115A. Under that section, CMMI may "test innovative payment and service delivery models to reduce program expenditures . . . while preserving or enhancing the quality of care" provided under Medicare. 42 U.S.C. § 1315a(a)(1); *see id.* § 1315a(b)(1) (requiring that CMS "determine the effect of applying such models . . . on program expenditures . . . and the quality of care"). The statute does not define the term "test," so the Court should look to the word's "ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The relevant ordinary meaning of "test" is a "basis for evaluation" or "critical examination." *Test*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/test; *see Test*, American Heritage Dictionary (5th ed. 2022) ("[a] procedure for critical evaluation," "a trial"). It is "a procedure or operation carried out to resolve an uncertainty"—an "experiment." *Test*, Merriam-Webster Thesaurus Online, https://www.merriam-webster.com/thesaurus/test. As the Ninth Circuit explained in evaluating a neighboring statute, a "test" therefore requires some "research or experimental goal." *Beno v. Shalala*, 30 F.3d 1057, 1069 (9th Cir. 1994); *see* 42 U.S.C. § 1315.

To "test" whether a "payment [or] service delivery model[]" will "reduce program expenditures," whether the model will in fact have that effect must be an open question. 42 U.S.C.

§ 1315a(a)(1). If the model is *guaranteed* to reduce program expenditures, then there is no need to "evaluate" or "examine" the effect on program expenditures, nor any relevant "research or experimental goal." *Beno*, 30 F.3d at 1069. Such a model is not "carried out to resolve an uncertainty" about fiscal effects—it is carried out to achieve those predetermined effects.

Other provisions of Section 1115A reinforce the plain meaning of "test." The "Testing of Models (Phase I)" provision specifies that CMMI must test models "to determine the effect of such models . . . on program expenditures." 42 U.S.C. § 1315a(b)(1). Another provision requires that CMMI "conduct an evaluation of each model tested," including "an analysis of" whether there were "changes in spending." *Id.* § 1315a(b)(4)(A). By requiring a "test," Section 1115A therefore only authorizes "payment or service delivery models" for which the effect on program expenditures is not yet known.

GLOBE does not satisfy Section 1115A's "test" requirement. It will not "test" whether its changes to Medicare drug pricing will "reduce program expenditures" because the results are preordained. 42 U.S.C. § 1315a(a)(1). GLOBE is certain to enrich CMS at manufacturers' expense through a mechanical application of the GLOBE "rebate" formula. There is no question that the foreign reference price will necessarily be lower than the average sales price in the U.S. CMS itself repeatedly observes that "U.S. prescription drug prices . . . exceed those found in other OECD countries." 91 Fed. Reg. at 62,944.

Because GLOBE relies on prices in 19 non-U.S. OECD countries to calculate the foreign reference price, and then requires manufacturers to pay the differential between the foreign reference price and average sales price in the U.S. market, it is a foregone conclusion that manufacturers will owe substantial rebates to the government. Indeed, CMS anticipates that GLOBE will reduce Medicare spending by $440 million. 91 Fed. Reg. at 63,089 tbl.13. And it

explicitly states that "the model's rebate mechanism reduces [manufacturers'] effective reimbursement." *Id.* at 62,985.

Judicial decisions interpreting analogous provisions of Title 42 confirm that GLOBE is not a "test." In *Beno*, the HHS Secretary tried to justify an across-the-board benefits cut to California recipients of Aid to Families with Dependent Children as an "experimental, pilot or demonstration project" under 42 U.S.C. § 1315(a)—the provision that comes immediately before Section 1115A in the U.S. Code. 30 F.3d at 1060-62. The Ninth Circuit rejected HHS's characterization of the benefits cut—which was slated to "save $420 million annually"—as an "experiment." *Id.* at 1062, 1069. The court explained that the purpose of Section 1315(a) is to "test out new ideas and ways of dealing with the problems of public welfare recipients," so projects under that statute must have "a research or a demonstration value." *Id.* at 1069. "A simple benefits cut, which might save money, but has no research or experimental goal, would not satisfy this requirement." *Id.*; *see Newton-Nations v. Betlach*, 660 F.3d 370, 380 (9th Cir. 2011) (requiring some "experimental value"). The same reasoning applies here. The "immediate fiscal impact" of requiring manufacturers to pay CMS "is obvious," so GLOBE does not "test" or "experiment" with how its "rebate" requirement will affect program expenditures. *Beno*, 30 F.3d at 1069 n.30.

Section 1115A's history points in the same direction. CMS has never implemented a model that uniformly and certainly reduces program expenditures. *See supra* at 21-24. Every prior model (except for the swiftly enjoined 2020 MFN rule) tested whether incentive-based payment mechanisms would increase or decrease program expenditures. To give just one example, CMS hypothesized that its Enhancing Oncology Model—under which participating providers could receive additional payments or be required to repay CMS depending on their quality and efficiency of care during a six-month episode—would save the agency money by incentivizing higher-quality

and more cost-effective care. But it was also possible that the model would cost the agency money if providers reacted in ways that improved performance, requiring CMS to dole out additional payments, but resulted in more costly patient care in the longer term. *See supra* at 22 & n.8. GLOBE, by contrast, does not test any similar hypothesis about program expenditures.

CMS claims that GLOBE "tests a specific, meaningful hypothesis" that tying mandatory rebates to the drug prices in other countries "will reduce Medicare program spending while preserving or enhancing the quality of care." 91 Fed. Reg. at 63,081; *see id.* at 63,082 (asserting that GLOBE has a "testable hypothesis"). But the proposition that GLOBE will reduce Medicare program spending is not a genuine "hypothesis" because there is no uncertainty about whether it is true. It is a foregone conclusion that GLOBE will save CMS money by reducing the amount manufacturers are paid for providing Medicare Part B drugs. CMS admits as much, explaining that "manufacturers would likely not volunteer to participate, given that the model's rebate mechanism reduces their effective reimbursement." *Id.* at 62,985.

CMS also suggests it is an open question whether "prices for Part B rebatable drugs in reference countries are, on average, . . . lower than what Medicare pays," creating doubt as to whether manufacturers will have to pay rebates that exceed the statutory inflation rebate. 91 Fed. Reg. at 63,081. But that assertion contradicts CMS's unequivocal statements elsewhere in the rule that drug prices in the reference countries are lower than they are in the United States. *See*, *e.g.*, *id*. at 62,944 ("U.S. prescription drug prices, particularly for U.S. originator drugs, exceed those found in other OECD countries." (footnote omitted)); *see id.* at 62,937, 62,955 (similar).

Finally, CMS cannot save its flawed interpretation by focusing on the portion of the statute about "preserving or enhancing the quality of care." 42 U.S.C. § 1315a(a)(1). Given Section 1115A's function—"the study of how to spend less government money," *NFIB*, 567 U.S. at 704

(Scalia, Kennedy, Thomas, and Alito, JJ., dissenting)—the statute does not give CMS freestanding authority to test how to preserve or enhance the quality of care. Instead, it makes that goal contingent on expenditure reduction: CMS must test whether a policy "reduce[s] program expenditures . . . *while* preserving or enhancing the quality of care." Confirming that fiscal effects must be one of the unknown variables, Section 1115A further specifies that CMMI shall test models "to determine the effect of applying such models . . . on program expenditures . . . *and* the quality of care." 42 U.S.C. § 1315a(b)(1) (emphasis added). GLOBE flunks that test because the effect "on program expenditures" is known in advance. A model for which the effect on program expenditures is predetermined and only the effect on quality of care is unknown would not test both the effect "on program expenditures . . . *and* the quality of care." That a predetermined price reduction might have indeterminate downstream consequences on quality of care does not transform that price mandate into a qualifying test; otherwise, virtually any cost-cutting regulation could be relabeled as a statutory "test."

**2. GLOBE is not an "innovative payment or service delivery model."**

GLOBE exceeds CMS's authority under Section 1115A for an additional, independent reason: GLOBE is not an "innovative payment [or] service delivery model[]." 42 U.S.C. § 1315a(a)(1). GLOBE does nothing to change how healthcare services are delivered and so cannot be a "service delivery model." And while GLOBE mandates that manufacturers pay the government, it does not qualify as a "payment model."[15] As consistently understood throughout Section 1115A and other provisions of the U.S. Code, in judicial decisions, as a matter of plain

[15] In enacting Section 1115A, it is possible that Congress intended to authorize only "payment . . . delivery model[s]" rather than "payment model[s]." *See Paroline v. United States*, 572 U.S. 434, 447 (2014) ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all.") (citation omitted). But that just reinforces that GLOBE does not fit the statutory text because it does not change the method by which payments are "deliver[ed]" by CMS.

meaning, and by CMS itself, "payment model" describes *how* payment is made—that is, it refers to the structure or format for making payments. GLOBE does not fit the bill because it does not experiment with an innovative manner of structuring payments to alter provider or participant incentives, allocate risk, or reward quality and efficiency; it simply changes *how much* the government pays for drugs.

Section 1115A's illustrative list of models provides the best indication of what the phrase "payment model" means in context. The list starts off with "models that transition primary care practices away from fee-for-service based reimbursement and toward comprehensive payment or salary-based payment." 42 U.S.C. § 1315a(b)(2)(B)(i). Several of the other exemplar models also involve restructuring payment such that providers receive an overall amount that places the risk of inefficient practices on them instead of payment for each individual service. *See id.* § 1315a(b)(2)(B)(ii) ("[c]ontracting directly with groups of providers . . . to promote . . . risk-based comprehensive payment or salary-based payment"); *id.* § 1315a(b)(2)(B)(iv) ("transition[ing] health care providers away from fee-for-service based reimbursement and toward salary-based payment"); *id.* § 1315a(b)(2)(B)(xviii) ("[e]stablishing comprehensive payments to Healthcare Innovation Zones"). Another category of "payment models" identified by Congress involves implementing incentive payments to align with evidence-based guidelines or other care-related criteria. For example, the statute lists "[v]arying payment to physicians who order advanced diagnostic imaging services . . . according to the physician's adherence to appropriateness criteria," *id.* § 1315a(b)(2)(B)(vi); "[a]ligning nationally recognized, evidence-based guidelines of cancer care with payment incentives," *id.* § 1315a(b)(2)(B)(xii); and "[p]roviding . . . incentive payments to behavioral health providers . . . [and] community mental health centers," *id.* § 1315a(b)(2)(B)(xxv).

What all of the statutory examples have in common is that they involve changes to how payments are structured, with options like fee-for-service payments, comprehensive payments, salary-based payments, and incentive-based payments. Congress therefore anticipated that by developing "payment models," CMS would experiment with the method of payment—primarily by encouraging providers to sign up for new and innovative payment formats that better align with preferred outcomes. There is no indication that Congress wanted CMS to use "payment models" to impose a price ceiling divorced from participant performance or quality of care.

CMS resists the relevance of the statute's illustrative payment models on the ground that its authority is not limited to "the expressly enumerated model types." 91 Fed. Reg. at 62,946. But CMS misses the point: CMS is of course not limited to promulgating models identical to the listed examples, but those examples shed light on the permissible scope of the agency's Section 1115A authority. And none of the illustrative payment models involves direct changes to the amount of payment without any change to the structure or format of payment.

Other provisions of the U.S. Code that use the term "payment model" confirm that a Section 1115A "payment model" is a method for structuring how payments are made. For example, in 42 U.S.C. § 1395jjj, Congress established a Medicare "shared savings program," under which groups of providers are authorized to form "accountable care organization[s]" (ACOs) in order to "work together to manage and coordinate care." 42 U.S.C. § 1395jjj(a)(1)(A). As a default, the statute provides that payments will be made to ACOs "under the original Medicare fee-for-service program." *Id.* § 1395jjj(d)(1)(A). But the statute also gives the Secretary the "[o]ption to use other payment models" such as a "[p]artial capitation model," under which the "ACO is at financial risk for some, but not all, of the items and services" provided. *Id.* § 1395jjj(i). Another Medicare statute creates incentives for participating in "eligible alternative payment

models," such as models under which "payment for covered professional services" is "based on quality measures" or the provider "bears financial risk for monetary losses." *Id.* §§ 1395*l*(d), (z). "Payment model" has an identical meaning in the Medicaid statutes. *See, e.g.*, *id.* § 1396w-8(a).

Judicial decisions use the phrase "payment model" in the same way. For example, a Ninth Circuit opinion states that "[t]raditional Medicare uses a fee-for-service payment model," but that "experts came to realize this payment *structure* encourages healthcare providers to order more tests and procedures than medically necessary." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018) (emphasis added). The court explained that Medicare Advantage instead uses a "capitation" payment model, under which "private health insurance organizations provide Medicare benefits in exchange for a fixed monthly fee per person . . . regardless of actual healthcare usage." *Id.* Other circuits have likewise used "payment model" to refer to different ways of structuring how healthcare payments are made. *See, e.g.*, *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 351 (3d Cir. 2016) ("Risk-based contracting is an alternative payment model to the traditional fee-for-service model . . . ."); *Tex. Tech Physicians Assocs. v. HHS*, 917 F.3d 837, 840 (5th Cir. 2019) (describing an "alternative payment model" under which "participating programs could earn monthly fees contingent on achieving cost savings of 5%"); *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 737 (7th Cir. 2021) ("In the late 1980s and 1990s, the capitation-payment model became common in the healthcare industry.").

Plain meaning confirms that a "payment model" involves the "how" rather than the "how much" of payment. If an employer raised hourly wages from $15 to $20, no one would say that the employer had instituted a new "payment model." But if the employer announced that the business was transitioning from salaries to commission-based compensation, it would be natural to describe that as a change in the business's "payment model." Cases from outside the healthcare

context confirm this common-sense understanding of "payment model." *See, e.g.*, *Reed v. Brex, Inc.*, 8 F.4th 569, 579 (7th Cir. 2021) (noting that, under the Fair Labor Standards Act, employers may supplement "a commission-based payment model" with "periodic payments" like "advances"); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1363 (Fed. Cir. 2008) (describing a "new payment model" for processing credit-card transactions that inserts a "financial processing entity" between customers and merchants).

CMS has itself historically understood "payment model" to refer to how payment is made rather than the amount of payment. For example, a CMS slideshow from 2013 explained that "[a] payment model refers to the manner in which a payer reimburses providers."[16] And as "[t]wo examples of payment models," CMS listed "[b]undled episode-of-care payments" and "[c]apitated payments."[17] CMS's past Section 1115A models reinforce that understanding of "payment model." As described above, those models generally move payment structures towards episode-based or incentive-based systems where Medicare providers can earn more or less depending on the quality and efficiency of care provided. *See supra* at 21-24. So GLOBE, which unlike past models changes the amount rather than structure of payment, is inconsistent with the agency's own longstanding understanding of what qualifies as a "payment model."

This history also refutes CMS's argument that GLOBE involves "changes to payment incentives." 91 Fed. Reg. at 62,945. Unlike in CMS's prior examples, manufacturers cannot reduce or eliminate their payment obligation by improving their performance or patients' quality of care. GLOBE therefore does not leverage variable payments or other payment structures to advance superior healthcare; it simply requires manufacturers to make payments to CMS tied to

---

[16] CMS, *Health Care Innovation Awards – Round Two: Payment Models* (July 11, 2013), https://www.cms.gov/priorities/innovation/files/slides/hciatwopymtmdls.pdf.
[17] *Id.*

the external metric of foreign drug prices.

Finally, construing Section 1115A's "payment model" requirement in this way accords with the statute's central purpose: "the study of how to spend less government money." *NFIB*, 567 U.S. at 704 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). Changing how payment is structured advances that goal by testing (as the episode-based-payment or incentive-system models do) whether that change could potentially save money. For instance, paying providers more for positive outcomes *could* save money overall by reducing the need for expensive follow-up interventions. Or it could cost the government money by increasing payments related to certain positive outcomes without any resulting or corresponding changes in the rates or costs of follow-up interventions. By contrast, commanding manufacturers to make payments to CMS based on "benchmarks" calculated from drug prices in foreign countries does not aid in the "study" of how to spend less government money—it simply spends less money. Nor is straightforwardly lowering the price of Medicare Part B drugs "innovative" in any way. Thus, the statutory phrases "test" and "innovative payment and service delivery models" work together to define CMMI's circumscribed function. And GLOBE does not fit within it.

**3. GLOBE does not "address[] a defined population for which there are deficits in care."**

Even if GLOBE qualified as a "test" of a "payment [or] service delivery model," it would still be unlawful because it fails to satisfy Section 1115A's strict conditions for a Phase I test. 42 U.S.C. § 1315a(b). Phase I testing is permitted only "where the Secretary determines that there is evidence that the model addresses a defined population for which there are deficits in care leading to poor clinical outcomes or potentially avoidable expenditures." *Id.* § 1315a(b)(2)(A). Past models have satisfied that requirement by targeting subsets of the Medicare population with specific medical conditions and deficiencies in care: For example, the CJR model focused on

patients undergoing joint replacements, who were experiencing "confusing, uncoordinated care before and after . . . surgery" leading "to complications or prolonged recovery."[18]

Unlike past models, GLOBE does not target "a defined population for which there are deficits in care." 42 U.S.C. § 1315a(b)(2)(A). GLOBE imposes CMS's "model" on 25% of all Original Medicare Part B beneficiaries, arbitrarily chosen based on ZIP Code, who happen to take a Part B drug. So the GLOBE population is random, not defined, and is selected based on geography, not a shared deficit in care (and not based on "evidence" related to any such deficits). CMS admits as much, stating that it chose not to "[s]elect[] geographic areas with the populations most affected by affordability challenges or access barriers," in order to ensure the beneficiaries were "randomiz[ed]." 91 Fed. Reg. at 62,980.

CMS asserts that GLOBE addresses a defined population with deficits in care because it has "focused the model test on [drug classifications] that will target patients in therapeutic areas most likely to experience significant financial burden due to high drug costs." 91 Fed. Reg. at 62,980. And it claims that high drug costs can "result in poor clinical outcomes" due to "financial distress" or more limited access to treatments. *Id.* But even assuming high out-of-pocket costs qualify as a "deficit in care," the evidence refutes CMS's claim that the GLOBE patient population experiences that deficit. As CMS acknowledges, the vast majority of Original Medicare Part B beneficiaries have supplemental insurance that leaves them with no or limited liability for out-of-pocket drug costs. *See* 91 Fed. Reg. at 63,091. So contrary to CMS's claim, the patients subject to GLOBE are *not* "likely to experience significant financial burden due to high drug costs." *Id.* at 62,980. And while CMS suggests that Medicare Part B beneficiaries also experience high

---

[18] CMMI, *CJR (Comprehensive Care for Joint Replacement) Model*, https://www.cms.gov/priorities/innovation/innovation-models/cjr.

premiums, it makes no effort to show that premiums present a barrier to care. *See id.* at 62,973.

Relatedly, GLOBE fails to satisfy the statutory requirement that a model "address" the identified deficit in care. GLOBE contains a provision for recalculating coinsurance obligations for covered drugs whereby Original Medicare Part B beneficiaries covered by GLOBE would pay 20% of the foreign reference price. 91 Fed. Reg. at 62,938. But that purported coinsurance benefit is largely illusory since, as explained above, nearly all Original Medicare Part B beneficiaries have supplemental coverage and so do not pay Part B coinsurance. *See id.* at 62,945 ("[B]eneficiaries with supplemental insurance may not directly benefit from the coinsurance reduction."). Indeed, CMS does not contest that only 22,000 beneficiaries (0.3 percent) "would see out-of-pocket changes." *Id.* at 63,091. Nor will beneficiaries see any non-trivial reduction to their Medicare premiums; on the contrary, CMS's estimates suggest that beneficiaries will save roughly $0.43 each year. *See id.* at 63,089 tbls. 13-14.[19] A policy with no appreciable effect on the only potential deficit in care that CMS has identified does not "address" that deficit. If anything, GLOBE's price controls will exacerbate deficits in care by harming investments to develop innovative medicines.

**4. GLOBE does not "waive" existing requirements.**

GLOBE runs afoul of Section 1115A in yet another way: It impermissibly seizes on a limited "waiver" authority to replace the IRA inflation rebate that Congress crafted with a different, more onerous rebate that Congress never approved.

Section 1115A(d)(1) permits the Secretary to "waive" certain requirements in the Social Security Act "as may be necessary solely for [the] purposes of carrying out this section with respect to testing" Phase I models. 42 U.S.C. § 1315a(d)(1). To "waive" means to "mak[e] compliance

---

[19] *See Four Cents per Beneficiary a Month: Breaking Down GLOBE's Medicare Part B Premium Savings*, https://www.magnoliamarketaccess.com/insight/globe-model-medicare-part-b-premium-savings.

no longer necessary." *Nebraska*, 600 U.S. at 497; *see Waive*, American Heritage Dictionary, *supra* ("[t]o refrain from insisting on or enforcing"). So where, as here, a statute authorizes an agency to "waive . . . requirements" of a statutory scheme, 42 U.S.C. § 1315a(d)(1), the agency may "relax existing legal requirements," *Nebraska*, 600 U.S. at 498—but it may not add "new and substantially different provisions" or otherwise rewrite the statute. *Id.*

GLOBE invokes CMS's "waiver" authority for the impermissible purpose of adding "new and substantially different provisions" to the Medicare statute. *Nebraska*, 600 U.S. at 498. CMS states that it is "waiv[ing]. . . the Medicare Part B drug inflation rebate calculation provisions" in the IRA in order "to implement [its] proposed alternative calculation for the rebate amount." 91 Fed. Reg. at 63,079. In other words, CMS reads into the limited authority to "waive" the power to singlehandedly replace the inflation rebate amount that Congress codified in the IRA with a wholly new—and higher—rebate amount based on foreign drug prices. GLOBE's rebate-calculation method bears no relation to domestic inflation—the focal point of the Part B inflation rebate under the *Inflation* Reduction Act. It is instead a means of foisting MFN pricing on Medicare Part B even though Congress has considered and rejected that very pricing mechanism.

Confirming that GLOBE cannot be justified as a "waiver" of the IRA's requirements, CMS does not even purport to "relax existing legal requirements." *Nebraska*, 600 U.S. at 498. GLOBE does not "mak[e] compliance" with the IRA's existing rebate requirement "no longer necessary." *Id.* at 497. Rather, GLOBE specifies that if the inflation rebate amount is higher than the foreign-benchmark rebate amount, then the inflation rebate will remain operative. 91 Fed. Reg. at 63,028. Thus, the mandatory rebate amount can never fall below what the IRA would have required.

CMS attempts to stretch the term "waiver" even further, suggesting that GLOBE's establishment of a new enforcement regime, complete with civil penalties, is enabled by its waiver

of the IRA rebate calculation provisions. GLOBE purports to authorize CMS to impose, among other sanctions, civil money penalties equal to 125% of the GLOBE rebate amount by importing the regulations governing the IRA's rebate penalties and replacing any references to the inflation-rebate amount with references to the GLOBE rebate amount. 91 Fed. Reg. at 63,116; *see* 42 C.F.R. § 427.600. CMS's theory appears to be that, by replacing the IRA inflation-rebate amount with its preferred amount under GLOBE, it can repurpose the IRA's penalties for failure to pay the inflation rebate to punish noncompliance with GLOBE. But that theory does not work: The IRA's inflation-rebate penalties apply only when a manufacturer fails to comply "with the requirement under subsection (a)(2)" of the IRA, not with the requirements of GLOBE. 42 U.S.C. § 1395w-114b(e). And while CMS cites its general civil-monetary-penalty authority as a fallback, 91 Fed. Reg. at 63,116, that provision authorizes penalties only for the submission of "false record[s]" or "false and fraudulent claim[s]" up to $100,000 per false statement. 42 U.S.C. § 1320a-7a(a)(8). In short, CMS lacks authority to penalize manufacturers who fail to comply with GLOBE—and the agency's novel imposition of penalties far exceeds any "waiver" authority.

The Supreme Court's decision in *Biden v. Nebraska* squarely forecloses CMS's understanding of its Section 1115A waiver authority. There, the Court evaluated whether the Higher Education Relief Opportunities for Students Act of 2003 authorized the Secretary of Education to establish a student loan forgiveness program. 600 U.S. at 483. The Secretary invoked as the basis for his authority a provision of that Act that permitted him to "waive or modify" provisions "applicable to the student financial assistance programs under title IV of the [Education Act]" under certain circumstances. *Id.* at 494 (quoting 20 U.S.C. § 1098bb(a)(1)). As relevant here, the Court rejected the Secretary's argument that his authority to "waive" legal provisions enabled him to craft new provisions: "The addition of . . . new and substantially different

provisions cannot be said to be a 'waiver' of the old in any meaningful sense." *Id*. at 498. The Secretary's "comprehensive debt cancellation plan" had not only "nullif[ied] existing provisions, but augment[ed] and expand[ed] them dramatically." *Id*. at 499. Such an "exhaustive rewriting of the statute" could not "fairly be called a waiver" (or even a modification). *Id*. at 499-500.

The Supreme Court's reasoning is on all fours here. "What [GLOBE] has actually done is draft a new section of the [IRA] from scratch by 'waiving' provisions root and branch and then filling the empty space with radically new text." *Id*. at 498. Section 1115A's waiver provision does not grant that sweeping authority to remake the Medicare statute. Lacking a real response, CMS asserts that *Biden v. Nebraska*'s analysis of the term "waive" does not apply because Section 1115A "expressly authorizes" GLOBE. 91 Fed. Reg. at 63,078. But in *Nebraska*, the Supreme Court rejected the government's similar claim that its loan-forgiveness program "operate[d] squarely within . . . express statutory parameters." 91 Fed. Reg. at 63,078-79. Thus, under *Nebraska*, the plain meaning of statutory terms like "waive" prevails over an agency's say-so.

**C. GLOBE Violates Other Provisions of Federal Law.**

**1. GLOBE violates Section 1182 of the Social Security Act.**

GLOBE not only exceeds CMS's statutory authority under Section 1115A, but it also contravenes Section 1182(e) of the Social Security Act. That provision prohibits the Secretary of HHS from using quality adjusted life years (QALYs) or "similar measure[s] that discount[] the value of a life because of an individual's disability" "as a threshold to determine coverage, reimbursement, or incentive programs" under Medicare. 42 U.S.C. § 1320e-1(e). The QALY methodology aims to quantify the value of a particular health intervention based on how many "life years," adjusted by "quality" of those years, the intervention saves. Built into the metric of QALYs is the notion that those with chronic conditions, disabilities, and rare diseases have "lower quality" lives. Many foreign countries rely on QALYs to make healthcare decisions, such as

whether and on what terms a drug may be marketed. As a result, drugs that target conditions experienced by younger, otherwise-healthy people are prioritized over drugs that target conditions that are more likely to be experienced by the elderly, disabled, or chronically ill. That kind of discriminatory rationing is inconsistent with American values, as Congress recognized by enacting Section 1182's prohibition on use of QALYs in Medicare determinations.

CMS has repeatedly acknowledged that it may not rely on QALYs as a threshold to make decisions about drug coverage and pricing in the Medicare program. *See, e.g.*, Medicare Program; Transitional Coverage for Emerging Technologies, 89 Fed. Reg. 65,724, 65,744 (Aug. 12, 2024). Nonetheless, CMS has embedded QALYs within GLOBE's central provisions. Fifteen of the nineteen countries included in GLOBE's international comparator group use QALYs, either formally or informally, to set reimbursement rates for pharmaceuticals.[20] GLOBE thus imports the use of QALYs from those countries through its rebate calculation formula—in contravention of Section 1182's command that the United States will not subject our Nation's seniors and disabled individuals to QALY-based decision-making. And while CMS insists that GLOBE "does not establish a QALY based reimbursement formula," but rather simply imports prices from countries that use the metric as an "input into an alternative rebate amount calculation," 91 Fed. Reg. at 63,007, that argument does not withstand scrutiny: CMS, after all, "has no authority 'to do indirectly what it could not do directly.'" *Pub. Utils. Comm'n of State of Cal. v. FERC*, 143 F.3d 610, 616 (D.C. Cir. 1998) (citation omitted).

**2. GLOBE violates federal appropriations laws.**

GLOBE also violates federal appropriations laws by augmenting CMS's funds with

[20] Julia Wahl et al., *QALY Use in Selected OECD Countries*, Copenhagen Economics, at 3 & tbl.1, https://copenhageneconomics.com/wp-content/uploads/2026/02/QALY-use-in-selected-OECD-countries-February-2026-1.pdf.

unauthorized rebates. At the heart of federal appropriations law is the Constitution's Appropriations Clause, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. And Congress has implemented the Appropriations Clause with several related statutes that prohibit the government from collecting or using unauthorized funds. *See* 31 U.S.C. § 3302(c)(1); *id.* § 1301(a); 18 U.S.C. § 209. Taken together, these commands mean that "an agency may not augment its appropriations from outside sources without specific statutory authority." GAO, 2 *Principles of Federal Appropriations Law*, at 6-162 (3d ed. Mar. 10, 2016).

GLOBE transgresses that fundamental anti-augmentation rule. It increases CMS's available funds by ordering manufacturers to pay rebates that are directly deposited into the agency's Supplementary Medical Insurance (SMI) Trust Fund, which pays for Medicare Part B and Medicare Part D expenditures. 91 Fed. Reg. at 62,953. CMS claims that GLOBE does not violate anti-augmentation principles because the IRA directs that rebate payments be deposited in the SMI Trust Fund. *Id.* at 62,953-54. But the IRA authorizes only *inflation* rebate payments to be deposited in that account; it is not a license for CMS to demand and retain different rebate payments that Congress has not provided for. Because no Act of Congress authorizes CMS to collect or fund its activities with GLOBE rebates, GLOBE is an unauthorized augmentation of the agency's appropriations. If CMS wants more money for its activities, it must look to Congress.

## II. IF SECTION 1115A AUTHORIZES GLOBE, IT IS UNCONSTITUTIONAL.

For the foregoing reasons, the best reading of Section 1115A is that it does not authorize GLOBE. But if there were any question, the imperative to avoid an interpretation of Section 1115A that "raises serious constitutional doubts" would settle the matter. *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Accepting CMS's interpretation of Section 1115A would put the statute in irreconcilable conflict with both the Presentment Clause and the nondelegation doctrine.

### A. As Interpreted by CMS, Section 1115A Would Violate the Presentment Clause.

If Section 1115A were construed to permit GLOBE, the statute would violate the Presentment Clause, which requires that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States." U.S. Const. art. I, § 7, cl. 2. "The power to make law resides exclusively with the legislative branch." *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 36 (D.D.C. 2025) (Lamberth, J.). "By providing that no law could take effect without the concurrence of the prescribed majority of the Members of both Houses, the Framers reemphasized their belief . . . that legislation should not be enacted unless it has been carefully and fully considered by the Nation's elected officials." *INS v. Chadha*, 462 U.S. 919, 948-49 (1983).

"Amendment and repeal of statutes, no less than enactment, must conform with" the Constitution's bicameralism and presentment requirements. *Chadha*, 462 U.S. at 954. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). In *Clinton*, the Supreme Court explained that these principles forbid the Executive Branch from exercising "discretionary authority" to "reject[] the policy judgment made by Congress and rely[] on [its] own policy judgment." *Id.* at 441, 444.

If GLOBE is consistent with Section 1115A, then Section 1115A is inconsistent with the Presentment Clause. GLOBE would effectively erase Congress's inflation-rebate calculation from the U.S. Code and replace it with a completely different formula of CMS's own making. And it would enact civil monetary penalties that Congress has never authorized. That altered "version" of the Medicare statute would not be "the product of the 'finely wrought' procedure that the Framers designed." *Clinton*, 524 U.S. at 440. A statute cannot empower CMS to "reject[] the policy judgment made by Congress" about Medicare drug pricing in favor of CMS's "own policy

judgment" without running afoul of the Presentment Clause. *Id.* at 441, 444.

### B. As Interpreted by CMS, Section 1115A Would Violate the Nondelegation Doctrine.

Finally, if Section 1115A authorized GLOBE, then the statute would violate the nondelegation doctrine, which "bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 588 U.S. 128, 132 (2019) (plurality opinion). The Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. "Th[e] text permits no delegation of those powers." *Whitman*, 531 U.S. at 472.

Under the Supreme Court's nondelegation-doctrine case law, a statutory delegation is permissible only if Congress has made clear "the general policy" that the Executive Branch must pursue and delineated the "boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). "[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475.

CMS reads Section 1115A to give it the power to set Medicare drug-pricing policy for the Nation, with no meaningful limits on the agency's discretion. And by using Section 1115A to overhaul the Medicare program, CMS has defied the policies that Congress set in enacting the relevant statutes. Far from giving effect to an "intelligible principle" laid down by Congress, *Whitman*, 531 U.S. at 474, GLOBE would undo Congress's considered choices, based solely on the power to "test" a "model." That result cannot be reconciled with the nondelegation doctrine.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment should be granted, and the Court should vacate the challenged rule in full. 5 U.S.C. § 706(2).

Dated: November 4, 2026

Respectfully submitted,

/s/ *Elizabeth B. Prelogar*

Elizabeth B. Prelogar (D.C. Bar No. 1011890)
Joshua Revesz (D.C. Bar No. 1616617)
Elias S. Kim (*pro hac vice*)
Jade Ford (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

Connie L. Wang (*pro hac vice*)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

*Counsel for Plaintiff Pharmaceutical Research and Manufacturers of America*